Justice Breyer
delivered the opinion of the Court.
Frank G. Spisak, Jr., the respondent, was convicted in an Ohio trial court of three murders and two attempted murders. He was sentenced to death. He filed a habeas corpus petition in federal court, claiming that constitutional errors occurred at his trial. First, Spisak claimed that the jury instructions at the penalty phase unconstitutionally required the jury to consider in mitigation only those factors that the jury unanimously found to be mitigating. See Mills v. Maryland, 486 U. S. 367 (1988). Second, Spisak claimed that he suffered significant harm as a result of his counsel’s inadequate closing argument at the penalty phase of the proceeding. See Strickland v. Washington, 466 U. S. 668 (1984). The Federal Court of Appeals accepted these argu *142 ments and ordered habeas relief. We now reverse the Court of Appeals.
I
In 1983, an Ohio jury convicted Spisak of three murders and two attempted murders at Cleveland State University in 1982. The jury recommended, and the judge imposed, a death sentence. The Ohio courts denied Spisak’s claims, both on direct appeal and on collateral review. State v. Spisak, 36 Ohio St. 3d 80, 521 N. E. 2d 800 (1988) (per curiam); State v. Spisak, No. 67229, 1995 WL 229108 (Ohio App., 8th Dist., Cuyahoga Cty., Apr. 13, 1995); State v. Spisak, 73 Ohio St. 3d 151, 652 N. E. 2d 719 (1995) (per curiam).
Spisak then sought a federal writ of habeas corpus. Among other claims, he argued that the sentencing phase of his trial violated the U. S. Constitution for the two reasons we consider here. The District Court denied his petition. Spisak v. Coyle, Case No. 1:95CV2675 (ND Ohio, Apr. 18, 2003), App. to Pet. for Cert. 95a. But the Court of Appeals accepted Spisak’s two claims, namely, his mitigation instruction claim and his ineffeetive-assistance-of-counsel claim. Spisak v. Mitchell, 465 F. 3d 684, 703-706, 708-711 (CA6 2006). The Court of Appeals consequently ordered the District Court to issue a conditional writ of habeas corpus forbidding Spisak’s execution. Id., at 715-716.
The State of Ohio then sought certiorari in this Court. We granted the petition and vacated the Court of Appeals’ judgment. Hudson v. Spisak, 552 U. S. 945 (2007). We remanded the case for further consideration in light of two recent cases in which this Court had held that lower federal courts had not properly taken account of the deference federal law grants state-court determinations on federal habeas review. Ibid.; see 28 U. S. C. § 2254(d); Carey v. Musladin, 549 U. S. 70 (2006); Schriro v. Landrigan, 550 U. S. 465 (2007). On remand, the Sixth Circuit reinstated its earlier *143 opinion. Spisak v. Hudson, 512 F. 3d 852, 853-854 (2008). The State again sought certiorari. We again granted the petition. And we now reverse.
II
Spisak’s first claim concerns the instructions and verdict forms that the jury received at the sentencing phase of his trial. The Court of Appeals held the sentencing instructions unconstitutional because, in its view, the instructions, taken together with the forms, “require[d]” juror “unanimity as to the presence of a mitigating factor” — contrary to this Court’s holding in Mills v. Maryland, supra. 465 F. 3d, at 708. Since the parties do not dispute that the Ohio courts “adjudicated” this claim, i. e., they considered and rejected it “on the merits,” the law permits a federal court to reach a contrary decision only if the state-court decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U. S. C. § 2254(d)(1). Unlike the Court of Appeals, we conclude that Spisak’s claim does not satisfy this standard.
The parties, like the Court of Appeals, assume that Mills sets forth the pertinent “clearly established Federal law.” While recognizing some uncertainty as to whether Mills was “clearly established Federal law” for the purpose of reviewing the Ohio Supreme Court’s opinion, we shall assume the same. Compare Williams v. Taylor, 529 U. S. 362, 390 (2000) (Stevens, J., for the Court) (applicable date for purposes of determining whether “Federal law” is “established” is when the “state-court conviction became final”), with id., at 412 (O’Connor, J., for the Court) (applicable date is “the time of the relevant state-court decision”); see State v. Spisak, 36 Ohio St. 3d 80, 521 N. E. 2d 800 (decided Apr. 13, 1988), cert. denied, 489 U. S. 1071 (decided Mar. 6, 1989); Mills v. Maryland, supra (decided June 6, 1988).
*144 A
The rule the Court set forth in Mills is based on two well-established principles. First, the Constitution forbids imposition of the death penalty if the sentencing judge or jury is “‘“precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” ’ ” 486 U. S., at 374 (quoting Eddings v. Oklahoma, 455 U. S. 104, 110 (1982), in turn quoting Lockett v. Ohio, 438 U. S. 586, 604 (1978) (plurality opinion)). Second, the sentencing judge or jury “ ‘may not refuse to consider or he prechided from considering “any relevant mitigating evidence.” ’ ” Mills, 486 U. S., at 374-375 (quoting Skipper v. South Carolina, 476 U. S. 1, 4 (1986), in turn quoting Eddings, supra, at 114).
Applying these principles, the Court held that the jury instructions and verdict forms at issue in the case violated the Constitution because, read naturally, they told the jury that it could not find a particular circumstance to be mitigating unless all 12 jurors agreed that the mitigating circumstance had been proved to exist. Mills, 486 U. S., at 380-381, 384. If, for example, the defense presents evidence of three potentially mitigating considerations, some jurors may believe that only the first is mitigating, some only the second, and some only the third. But if even one of the jurors believes that one of the three mitigating considerations exists, but that he is barred from considering it because the other jurors disagree, the Court held, the Constitution forbids imposition of the death penalty. See id., at 380, 384; see also McKoy v. North Carolina, 494 U. S. 433, 442-443 (1990) (“Mills requires that each juror be permitted to consider and give effect to . . . all mitigating evidence in deciding . . . whether aggravating circumstances outweigh mitigating circumstances . . . ”). Because the instructions in Mills would have led a reasonable juror to believe the contrary, *145 the Court held that the sentencing proceeding violated the Constitution. 486 U. S., at 374-375.
B
In evaluating the Court of Appeals’ determination here, we have examined the jury instructions and verdict forms at issue in Mills and compared them with those used in the present case. In the Mills sentencing phase, the trial judge instructed the jury to fill out a verdict form that had three distinct parts. Section I set forth a list of 10 specific aggravating circumstances next to which were spaces where the jury was to mark “yes” or “no.” Just above the list, the form said:
“Based upon the evidence we unanimously find that each of the following aggravating circumstances which is marked ‘yes’ has been proven . . . and each aggravating circumstance which is marked ‘no’ has not been proven....” Id., at 384-385 (emphasis added; internal quotation marks omitted).
Section II set forth a list of eight potentially mitigating circumstances (seven specific circumstances and the eighth designated as “other”) next to which were spaces where the jury was to mark “yes” or “no.” Just above the list the form said:
“Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked ‘yes’ has been proven to exist . . . and each mitigating circumstance marked ‘no’ has not been proven ....” Id., at 387 (emphasis added; internal quotation marks omitted).
Section III set forth the overall balancing question, along with spaces for the jury to mark “yes” or “no.” It said:
“Based on the evidence we unanimously find that it has been proven . . . that the mitigating circumstances *146 marked ‘yes’ in Section II outweigh the aggravating circumstances marked ‘yes’ in Section I.” Id., at 388-389 (emphasis added; internal quotation marks omitted).
Explaining the forms, the judge instructed the jury with an example. He told the jury that it should mark “ ‘yes’ ” on the jury form if it “ ‘unanimously’ ” concluded that an aggravating circumstance had been proved. Id., at 378. Otherwise, he said, “‘of course you must answer no.’” Ibid. (emphasis deleted). These instructions, together with the forms, told the jury to mark “yes” on Section IPs list of mitigating factors only if the jury unanimously concluded that the particular mitigating factor had been proved, and to consider in its weighing analysis in Section III only those mitigating factors marked “yes” in Section II. Thus, as this Court found, the jury was instructed that it could consider in the ultimate weighing of the aggravating and mitigating evidence only the mitigating factors that the jury had unanimously found to exist. See id., at 380-381.
The instructions and jury forms in this case differ significantly from those in Mills. The trial judge instructed the jury that the aggravating factors it would consider were the specifications that the jury had found proved beyond a reasonable doubt at the guilt phase of the trial — essentially, that each murder was committed in a course of conduct including the other crimes, and, for two of the murders, that the murder was committed with the intent to evade apprehension or punishment for another offense. 8 Tr. 2967-2972 (July 19, 1983).
He then explained the concept of a “mitigating factor.” After doing so, he listed examples, including that “the defendant because of a mental disease or defect . . . lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.” Id., at 2972-2973. The court also told the jury that it could take account of “any other” mitigating consideration it found “relevant to the issue of whether the defendant *147 should be sentenced to death.” Id., at 2973. And he instructed the jury that the State bore the burden of proving beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. Id., at 2965.
With respect to “the procedure” by which the jury should reach its verdict, the judge told the jury only the following:
“[Y]ou, the trial jury, must consider all of the relevant evidence raised at trial, the evidence and testimony received in this hearing and the arguments of counsel. From this you must determine whether, beyond a reasonable doubt, the aggravating circumstances, which [Spisak] has been found guilty of committing in the separate counts are sufficient to outweigh the mitigating factors present in this case.
“If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstance in each separate count outweighs the mitigating factors, then you must return that finding to the Court.
“On the other hand, if after considering all of the relevant evidence raised at trial, the evidence and the testimony received at this hearing and the arguments of counsel, you find that the State failed to prove beyond a reasonable doubt that the aggravating circumstances which [Spisak] has been found guilty of committing in the separate counts outweigh the mitigating factors, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court.” Id., at 2973-2975.
The judge gave the jury two verdict forms for each aggravating factor. The first of the two forms said:
“ We the jury in this case ... do find beyond a reasonable doubt that the aggravating circumstance . . . was sufficient to outweigh the mitigating factors present in this case.
*148 “ ‘We the jury recommend that the sentence of death be imposed....’” Id., at 2975-2976.
The other verdict form read:
“‘We the jury ... do find that the aggravating circumstances . . . are not sufficient to outweigh the mitigation factors present in this case.
‘“We the jury recommend that the defendant ... be sentenced to life imprisonment....’” Id., at 2976.
The instructions and forms made clear that, to recommend a death sentence, the jury had to find, unanimously and beyond a reasonable doubt, that each of the aggravating factors outweighed any mitigating circumstances. But the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously. Neither the instructions nor the forms said anything about how — or even whether — the jury should make individual determinations that each particular mitigating circumstance existed. They focused only on the overall balancing question. And the instructions repeatedly told the jury to “considefr] all of the relevant evidence.” Id., at 2974. In our view the instructions and verdict forms did not clearly bring about, either through what they said or what they implied, the circumstance that Mills found critical, namely,
“a substantial possibility that reasonable jurors, upon receiving the judge’s instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.” 486 U. S., at 384.
We consequently conclude that the state court’s decision upholding these forms and instructions was not “contrary to, or... an unreasonable application of, clearly established Fed *149 eral law, as determined by the Supreme Court of the United States” in Mills. 28 U. S. C. § 2254(d)(1).
We add that the Court of Appeals found the jury instructions unconstitutional for an additional reason, that the instructions “require[d] the jury to unanimously reject a death sentence before considering other sentencing alternatives.” 465 F. 3d, at 709 (citing Mapes v. Coyle, 171 F. 3d 408, 416-417 (CA6 1999)). We have not, however, previously held jury instructions unconstitutional for this reason. Mills says nothing about the matter. Neither the parties nor the courts below referred to Beck v. Alabama, 447 U. S. 625 (1980), or identified any other precedent from this Court setting forth this rule. Cf. Jones v. United States, 527 U. S. 373, 379-384 (1999) (rejecting an arguably analogous claim). But see post, at 158-160 (Stevens, J., concurring in part and concurring in judgment). Whatever the legal merits of the rule or the underlying verdict forms in this case were we to consider them on direct appeal, the jury instructions at Spisak’s trial were not contrary to “clearly established Federal law.” 28 U. S. C. § 2254(d)(1).
III
Spisak’s second claim is that his counsel’s closing argument at the sentencing phase of his trial was so inadequate as to violate the Sixth Amendment. To prevail, Spisak must show both that “counsel’s representation fell below an objective standard of reasonableness,” Strickland, 466 U. S., at 688, and that there is a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different,” id., at 694.
The Ohio Supreme Court held that Spisak’s claim was “not well-taken on the basis of our review of the record.” State v. Spisak, 36 Ohio St. 3d, at 82, 521 N. E. 2d, at 802 (citing, inter alia, Strickland, supra). The District Court concluded that counsel did a constitutionally adequate job and that “[tjhere simply is not a reasonable probability that, ab *150 sent counsel’s alleged errors, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Spisak v. Coyle, Case No. 1:95CV2675 (ND Ohio, Apr. 18, 2008), App. to Pet. for Cert. 204a. The Court of Appeals, however, reached a contrary conclusion. It held that counsel’s closing argument, measured by “‘an objective standard of reasonableness,’” was inadequate, and it asserted that “a reasonable probability exists” that adequate representation would have led to a different result. Spisak v. Mitchell, 465 F. 3d, at 703, 706 (quoting Strickland, supra, at 688). Responding to the State’s petition for certiorari, we agreed to review the Court of Appeals’ terse finding of a “reasonable probability” that a more adequate argument would have changed a juror’s vote.
In his closing argument at the penalty phase, Spisak’s counsel described Spisak’s killings in some detail. He acknowledged that Spisak’s admiration for Hitler inspired his crimes. He portrayed Spisak as “sick,” “twisted,” and “demented.” 8 Tr. 2896 (July 19, 1983). And he said that Spisak was “never going to be any different.” Ibid. He then pointed out that all the experts had testified that Spisak suffered from some degree of mental illness. And, after a fairly lengthy and rambling disquisition about his own decisions about calling expert witnesses and preparing them, counsel argued that, even if Spisak was not legally insane so as to warrant a verdict of not guilty by reason of insanity, he nonetheless was sufficiently mentally ill to lessen his culpability to the point where he should not be executed. Counsel also told the jury that, when weighing Spisak’s mental illness against the “substantial” aggravating factors present in the case, id., at 2924, the jurors should draw on their own sense of “pride” for living in “a humane society” made up of “a humane people,” id., at 2897-2900, 2926-2928. That humanity, he said, required the jury to weigh the evidence “fairly” and to be “loyal to that oath” the jurors had taken to uphold the law Id., at 2926.
*151 Spisak and his supporting amici say that this argument was constitutionally inadequate because: (1) It overly emphasized the gruesome nature of the killings; (2) it overly emphasized Spisak’s threats to continue his crimes; (3) it understated the facts upon which the experts based their mental illness conclusions; (4) it said little or nothing about any other possible mitigating circumstance; and (5) it made no explicit request that the jury return a verdict against death.
We assume for present purposes that Spisak is correct that the closing argument was inadequate. We nevertheless find no “reasonable probability” that a better closing argument without these defects would have made a significant difference.
Any different, more adequate closing argument would have taken place in the following context: Spisak admitted that he had committed three murders and two other shootings. Spisak’s defense at the guilt phase of the trial consisted of an effort by counsel to show that Spisak was not guilty by reason of insanity. And counsel, apparently hoping to demonstrate Spisak’s mentally defective condition, called him to the stand.
Spisak testified that he had shot and killed Horace Rickerson, Timothy Sheehan, and Brian Warford. He also admitted that he had shot and tried to kill John Hardaway, and shot at Coletta Dartt. He committed these crimes, he said, because he was a follower of Adolf Hitler, who was Spisak’s “spiritual leader” in a “war” for “survival” of “the Aryan people.” 4 id., at 1343-1344, 1396 (July 5, 1983). He said that he had purchased guns and stockpiled ammunition to further this war. Id., at 1406-1408. And he had hoped to “create terror” at Cleveland State University, because it was “one of the prime targets” where the “Jews and the system ... are brainwashing the youth.” Id., at 1426-1428.
Spisak then said that in February 1982 he had shot Rickerson, who was black, because Riekerson had made a sexual advance on Spisak in a university bathroom. He expressed *152 satisfaction at having “eliminated that particular threat.. . to me and to the white race.” 5 id., at 1511 (July 7, 1983). In June he saw a stranger, John Hardaway, on a train platform and shot him seven times because he had been looking for a black person to kill as “blood atonement” for a recent crime against two white women. 4 id., at 1416 (July 5, 1983). He added that he felt “good” after shooting Hardaway because he had “accomplished something,” but later felt “[k]ind of bad” when he learned that Hardaway had survived. Id., at 1424-1425. In August 1982, Spisak shot at Coletta Dartt because, he said, he heard her “making some derisive remarks about us,” meaning the Nazi Party. Id., at 1432-1435. Later that August, he shot and killed Timothy Sheehan because he “thought he was one of those Jewish professors . . . that liked to hang around in the men’s room and seduce and pervert and subvert the young people that go there.” 5 id., at 1465-1466 (July 7,1983). Spisak added that he was “sorry about that” murder because he later learned Sheehan “wasn’t Jewish like I thought he was.” Ibid. And three days later, while on a “search and destroy mission,” he shot and killed Brian Warford, a young black man who “looked like he was almost asleep” in a bus shelter, to fulfill his “duty” to “inflict the maximum amount of casualties on the enemies.” Id., at 1454-1455, 1478.
Spisak also testified that he would continue to commit similar crimes if he had the chance. He said about Warford’s murder that he “didn’t want to get caught that time because I wanted to be able to do it again and again and again and again.” Id., at 1699 (July 8, 1983). In a letter written to a friend, he called the murders of'Rickerson and Warford “the finest thing I ever did in my whole life” and expressed a wish that he “had a human submachine gun right now so I could exterminate” black men “and watch them scream and twitch in agony.” Id., at 1724-1725. And he testified that, if he still had his guns, he would escape from jail, “go out and continue the war I started,” and “continue to inflict the maxi *153 mum amount of damage on the enemies as I am able to do.” Id., at 1780-1781.
The State replied by attempting to show that Spisak was lying in his testimony about the Nazi-related motives for these crimes. The State contended instead that the shootings were motivated by less unusual purposes, such as robbery. See id., at 1680, 1816-1818.
The defense effort to show that Spisak was not guilty by reason of insanity foundered when the trial judge refused to instruct the jury to consider that question and excluded expert testimony regarding Spisak’s mental state. The defense’s expert witness, Dr. Oscar Markey, had written a report diagnosing Spisak as suffering from a “schizotypal personality disorder” and an “atypical psychotic disorder,” and as, at times, “unable to control his impulses to assault.” 6 id., at 1882-1883,1992 (July 11, 1983). His testimony was somewhat more ambiguous during a voir dire, however. On cross-examination, he conceded that he could not say Spisak failed Ohio’s sanity standard at the time of the murders. After Markey made the same concession before the jury, the court granted the prosecution’s renewed motion to exclude Markers testimony and instructed the jury to disregard the testimony that it heard. And the court excluded the defense’s proffered reports from other psychologists and psychiatrists who examined Spisak, because none of the reports said that Spisak met the Ohio insanity standard at the time of the crimes. Id., at 1898-1899, 1911-1912, 1995; id., at 2017, 2022 (July 12, 1983).
During the sentencing phase of the proceedings, defense counsel called three expert witnesses, all of whom testified that Spisak suffered from some degree of mental illness. Dr. Sandra McPherson, a clinical psychologist, said that Spisak suffered from schizotypal and borderline personality disorders characterized by bizarre and paranoid thinking, gender identification conflict, and emotional instability. She added that these defects “substantially impair his ability to *154 conform himself” to the law’s requirements. 8 id., at 2428-2429, 2430-2441 (July 16, 1983). Dr. Kurt Bertschinger, a psychiatrist, testified that Spisak suffered from a schizotypal personality disorder and that “mental illness does impair his reason to the extent that he has substantial inability to know wrongfulness, or substantial inability to refrain.” Id., at 2552-2556. Dr. Markey, whose testimony had been stricken at the guilt phase, again testified and agreed with the other experts’ diagnoses. Id., at 2692-2693, 2712-2713 (July 18, 1983).
In light of this background and for the following reasons, we do not find that the assumed deficiencies in defense counsel’s closing argument raise “a reasonable probability that,” but for the deficient closing, “the result of the proceeding would have been different.” Strickland, 466 U. S., at 694. We therefore cannot find the Ohio Supreme Court’s decision rejecting Spisak’s ineffective-assistance-of-eounsel claim to be an “unreasonable application” of the law “clearly established” in Strickland. § 2254(d)(1).
First, since the sentencing phase took place immediately following the conclusion of the guilt phase, the jurors had fresh in their minds the government’s evidence regarding the killings — which included photographs of the dead bodies, images that formed the basis of defense counsel’s vivid descriptions of the crimes — as well as Spisak’s boastful and unrepentant confessions and his threats to commit further acts of violence. We therefore do not see how a less descriptive closing argument with fewer disparaging comments about Spisak could have made a significant difference.
Similarly fresh in the jurors’ minds was the three defense experts’ testimony that Spisak suffered from mental illness. The jury had heard the experts explain the specific facts upon which they had based their conclusions, as well as what they had learned of his family background and his struggles with gender identity. And the jury had heard the experts draw connections between his mental illness and the crimes. *155 We do not see how it could have made a significant difference had counsel gone beyond his actual argument — which emphasized mental illness as a mitigating factor and referred the jury to the experts’ testimony — by repeating the facts or connections that the experts had just described.
Nor does Spisak tell us what other mitigating factors counsel might have mentioned. All those he proposes essentially consist of aspects of the “mental defect” factor that the defense experts described.
Finally, in light of counsel’s several appeals to the jurors’ sense of humanity — he used the words “humane people” and “humane society” 10 times at various points in the argument — we cannot find that a more explicit or more elaborate appeal for mercy could have changed the result, either alone or together with the other circumstances just discussed. Thus, we conclude that there is not a reasonable probability that a more adequate closing argument would have changed the result, and that the Ohio Supreme Court’s rejection of Spisak’s claim was not “contrary to, or ... an unreasonable application of,” Strickland. 28 U. S. C. §2254(d)(1).
Spisak contends that the deferential standard of review under § 2254(d)(1) should not apply to this claim because the Ohio Supreme Court may not have reached the question whether counsel’s closing argument caused Spisak prejudice. That is, the Ohio Supreme Court’s summary rejection of this claim did not indicate whether that court rested its conclusion upon a finding (1) that counsel was not ineffective, or (2) that a better argument would not have made a difference, or (3) both. See State v. Spisak, 36 Ohio St. 3d, at 82, 521 N. E. 2d, at 802. Spisak argues that, under these circumstances, a federal court should not defer to a state court that may not have decided a question, but instead should decide the matter afresh. Lower federal courts have rejected arguments similar to Spisak’s. See, e. g., Hennon v. Cooper, 109 F. 3d 330, 334-335 (CA7 1997); see also Weeks v. Angelone, 528 U. S. 225, 231, 237 (2000) (applying the § 2254(d) *156 standard in case involving a state court’s summary denial of a claim, though not a Strickland claim, and without full briefing regarding whether or how § 2254(d) applied to a summary decision); Chadwick v. Janecka, 312 F. 3d 597, 605-606 (CA3 2002) (Alito, J.) (relying on Weeks in holding that § 2254(d) applies where a state court denies a claim on the merits without giving any indication how it reached its decision); see generally 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §32.2, pp. 1574-1579 (5th ed. 2005 and 2008 Supp.). However, we need not decide whether deference under § 2254(d)(1) is required here. With or without such deference, our conclusion is the same.
For these reasons, the judgment of the Court of Appeals for the Sixth Circuit is reversed.

It is so ordered.