*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 27, 2020

Plaintiff-Appellee,

v

No. 344052
Ingham Circuit Court
LC No. 14-000502-FH

ARTHUR LEE HALL,

Defendant-Appellant.

Before: FORT HOOD, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

A jury convicted defendant, Arthur Lee Hall, of being a felon in possession of a firearm (felon-in-possession), MCL 750.224f(1), and possessing a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b(1). The trial court sentenced him as a fourth-offense habitual offender, MCL 769.12, to one to five years' imprisonment for his felon-in-possession conviction and to a consecutive term of five years' imprisonment for his felony-firearm conviction. Defendant appeals as of right, and we affirm.

## I. RELEVANT FACTS

The charges arise from a March 11, 2014 incident. Lansing Police Officer Michelle Hood[1] testified at defendant's trial that "shortly before four p.m." she was "flagged down by a pedestrian stating that there was a fight across the street." Hood looked across the street and saw two people, one of whom turned out to be defendant, arguing in the middle of the road. When Hood approached the men, each accused the other of shooting at him and claiming the other might have a gun. Being the only officer there at that point and due to the possible presence of a gun, Hood drew her weapon, told the men to lift their shirts so she could see if either was armed, ordered them to their knees, and held them there awaiting backup. After backup arrived and helped Hood

---

[1] The trial transcript alternatively identifies the witness as Officer Michelle Hood and Officer Michelle Hood Marble.

secure the two men, Hood and Canine Officer Rachel Bahl took the canine into what turned out to be defendant's barbershop to make sure no one was hiding in the building because they thought there was a third suspect on the loose. Officer Terry Blount, who was also at the scene, testified that defendant told him the barbershop was his place of business. Bahl testified that she noticed a silver car "parked in the parking lot just north of the businesses." She observed blood on the driver's door handle of the car. She looked inside the car through the windows and saw "cash, a cellphone, and a plastic baggy containing a white substance." Bahl transported defendant to the hospital; she noticed that he had some abrasions on his hands and head.

Scott Polhemus, a now-retired crime scene investigator for the Lansing Police Department, testified that he recovered a "45 caliber live round" from the scene of the incident and a "45 caliber spent shell casing." He also took part in executing a search warrant at the barbershop, during which he recovered a .45-caliber handgun, along with a magazine and four live rounds from the bottom of a box of light bulbs in the storage room, and a "380 handgun" in a Crown Royal bag located behind a hair clipper box on the top of a work station. Also on top of the work station was an envelope addressed to "Audi Hall"[2] at the barber shop's address. The envelope contained a commercial insurance proposal.

The caliber of the bullets found in the box containing the .45-caliber handgun was the same as those found at the scene outside. While forensic testing of the .380-caliber handgun produced inconclusive results due to insufficient or degraded DNA, the DNA swab from the .45-caliber handgun "matched the DNA types from [defendant]." Defendant had previously told an officer that a man with the street name of "BooMan" had fled the scene of the incident with the pistol involved in the shooting. Aware of this information, Detective Andrew Hogan confronted defendant about "the 45 caliber found in the light bulb case" matching the "45 spent casing and the 45 live round" that was found at the scene. Defendant replied, "[O]h, they must have put it in there." When Hogan "further confronted" defendant, defendant then "admitted that he had lied to [the detective]." Hogan also testified that defendant said that barber shops get robbed.[3]

After the prosecution completed its case-in-chief, defendant moved for a directed verdict. Opining that "this is not the strongest case that has ever been before [this court]," the court concluded that it would leave the case "in the capable hands of the jury," and denied the motion.

Defendant testified that on the date of the incident, he received a phone call from BooMan, whose real name is Gilbert Bailey and who was one of his regular clients, asking if defendant was at the barbershop and could give him a haircut. A short while later, Bailey called defendant to tell him that he was outside the barbershop. Defendant said that he told Bailey to come into the shop, but when Bailey told him that he had "some trees on deck," slang for marijuana, defendant told him to stay outside and went out to meet him. Defendant testified that he had a medical marijuana card at the time.

---

[2] Defendant confirmed in his testimony that his nickname is Audi.

[3] When he testified at trial, defendant admitted to making this statement to Hogan.

Defendant testified that when he went outside to get into the silver car that Bailey arrived in, he saw that Bailey was with another person, Jocquice Knox. Knox was in the driver's seat and Bailey was in the passenger seat, and when defendant got into the back seat, Knox got out of the car. As Knox walked away, Bailey "pulled out the gun" and said to defendant, "Bitch, run your pockets," which defendant explained means to take everything out of your pockets. Defendant told Bailey that he had only $45 in his coat, but Bailey did not believe him and again told defendant to "Run all your pockets." At that point, Knox banged on the car's door and urged Bailey to "bust" defendant. Defendant said that he threw what money he had in Bailey's face and dove toward the front seat in an effort to get the gun away from Bailey. The two fought over the gun. Defendant testified that he bit Knox's finger when Knox joined the scuffle and started kicking him in the head, which caused Knox to run away. The gun discharged during the struggle, at which point Bailey ran away. Defendant returned to the barber shop. As he was searching for his phone to call 911,[4] he realized that he still had the gun in his hand, so he put it in a box in the barber shop, explaining that "it was the first thing by the hallway going back towards out the door from the back way." He then went back outside and he and Knox continued to fight, at which point the police became involved.

The defense's theory was to acknowledge that defendant possessed the .45-caliber handgun, but to offer self-defense as a justification. In addition, defendant said that he dispossessed himself of the gun as soon as he could after the immediate threat ended. He denied knowing anything about the .380-caliber handgun and testified that the hair station where it was found was not his, that he was renting it to another barber. An employee who was working at the barbershop on the day of the incident testified that defendant did use the station where the gun was found.

After both parties had concluded their proofs, defendant renewed his prior motion for a directed verdict. The trial court denied the motion, again expressing its confidence in the jury system and choosing to leave the matter in the hands of the jury. After the trial court read the jury instructions, the court asked the attorneys for both sides:

[COURT]: Counsel, as to the reading of this set of instructions, the final set, do you approve?

[PROSECUTOR]: Yes, Your Honor, thank you.

[DEFENSE COUNSEL]: Yes, defense approves, judge.

[COURT]: Then I'm going to ask that this set go in with the jury as Court Exhibit 1. Any objection?

---

[4] During cross-examination, defendant stated that the gun discharged as he was walking away from Bailey, not during the struggle with Bailey. In addition, whether defendant called 911 and whether the cell phone he turned over to the police was in fact his, were matters of dispute.

[PROSECUTOR]: No, thank you.

[DEFENSE COUNSEL]: None, judge.

[COURT]: Admitted and it will go forward.

Defendant was convicted and sentenced as indicated.

## II. ANALYSIS

On appeal, defendant raises two claims of instructional error. He contends that the trial court plainly erred by failing to provide a specific unanimity instruction, and he argues that the trial court's instruction defining constructive possession was insufficient for purposes of the felon-in-possession charge. However, the failure to timely request an instruction constitutes a forfeiture of the issue, and an intentional relinquishment of a known right waives the issue and extinguishes the error. A defendant who waives an instructional issue cannot obtain appellate review. *People v Hall* (*On Remand*), 256 Mich App 674, 679; 671 NW2d 545 (2003). An explicit and repeated approval of an instruction constitutes waiver. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). Because defendant though his trial counsel explicitly and repeatedly approved the jury instructions, he has waived these instructional issues and extinguished any error.

Alternatively, defendant argues that his trial counsel provided ineffective assistance by failing to request a specific unanimity instruction and a proper instruction on the definition of constructive possession for purposes of the felon-in-possession charge. "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). Where, as here, a defendant has not moved for a new trial or a *Ginther*[5] hearing to develop the factual record in support of his ineffective assistance of counsel claims, our review is limited to mistakes that are apparent on the record. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). In order to prevail in his claim of ineffective assistance of counsel, defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. See *Smith v Spisak*, 558 US 139, 149; 130 S Ct 676; 175 L Ed 2d 595 (2010); *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

### 1. SPECIFIC UNANIMITY JURY INSTRUCTION

Defendant contends that his trial counsel rendered ineffective assistance by failing to request a specific unanimity instruction when the prosecutor presented evidence of materially distinct acts to support a single charge and when the jury's questions to the court during deliberations clearly signaled that it was confused as to the factual basis for the charged crimes. Defendant claims that these failures fell below an objective standard of reasonableness under prevailing professional norms, and that, but for counsel's deficient performance, there is a

---

[5] *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).

reasonable probability that the outcome of the trial would have been different. In support, defendant points to the trial judge's observations on the weakness of the prosecution's case and the strong plausibility of defendant's defenses.

"A defendant has the right to a unanimous verdict and it is the duty of the trial court to properly instruct the jury on this unanimity requirement." *Martin*, 271 Mich App 280, 338; 721 NW2d 815 (2006). "Under most circumstances, a general instruction on the unanimity requirement will be adequate."[6] *Id*. However,

> when the state offers evidence of multiple acts by a defendant, each of which would satisfy the actus reus element of a single charged offense, the trial court is required to instruct the jury that it must unanimously agree on the same specific act if the acts are materially distinct or if there is reason to believe the jurors may be confused or disagree about the factual basis of the defendant's guilt. [*People v Cooks*, 446 Mich 503, 530; 521 NW2d 275, 287 (1994).]

In other words, a specific unanimity instruction is required where the acts used to prove a single conviction are factually dissimilar or fall into conceptually distinct categories. See *id*. at 516, discussing *United States v Duncan*, 850 F2d 1104 (CA 6, 1988)[7] (holding that, where the prosecution presented two unrelated false statements to prove a single count of unlawful tax return, a unanimity instruction was required because the jury " 'needed to agree on the willful falsity of one factually distinct false statement because the statements are 'conceptually distinct' "); see also *Cooks*, 446 Mich at 513-514, discussing *United States v Gipson*, 553 F2d 453 (CA 5, 1977) (requiring a specific unanimity instruction where evidence of receiving stolen vehicles so differed from evidence of selling stolen vehicles that "a jury finding of the actus reus . . . would not be 'unanimous' if some of the jurors thought the defendant committed only an act in the first conceptual grouping while others believed he committed an act in the second").

When the acts alleged are not materially distinct or there is no reason to believe the jurors may be confused or disagree about the factual basis of the defendant's guilt, "a general instruction to the jury that its verdict must be unanimous does not deprive the defendant of his right to a unanimous verdict." *Cooks*, 446 Mich at 530; see *id*. at 529 (concluding that where the prosecution presented evidence of three identical penile-anal penetrations, either one of which fulfilled the actus reus of the single charged offense of first-degree criminal sexual conduct, the acts were materially indistinguishable and did not require a special unanimity instruction); see also *id*. at 517, discussing *United States v Ferris*, 719 F2d 1405 (CA 9, 1983) (holding that various acts of knowing possession were not inconsistent with each other and that jurors focusing on one set of acts would not be in disagreement with jurors focusing on another).

---

[6] It is undisputed that the trial court gave the proper general unanimity instruction.

[7] *Duncan* was overruled on other grounds by *Schad v Arizona*, 501 US 624; 111 S Ct 2491; 115 L Ed 2d 555 (1991).

In the present case, defendant's alleged acts of possession were not materially distinct, nor did the jury's questions during deliberations indicate confusion or disagreement as to the factual basis of charges against defendant. Because possession of one gun was conceptually indistinguishable from possession of the other gun, and defendant violated the law if the jury found he possessed either of them, there was no need for the jury to agree specifically as to which act of possession supported defendant's conviction. Assuming the jury believed defendant's version as to how he came into possession of the .45-caliber handgun, a finding that he possessed that gun in violation of MCL 750.224f(1) by failing terminate his possession at the earliest possible opportunity once the danger had passed is not materially distinguishable from a jury's finding that defendant possessed the .380-caliber gun in violation of MCL 750.224(1).

Even if we assume for the sake of argument that, although the facts of this case did not warrant a specific unanimity instruction, defense counsel's failure to request one constituted deficient performance, defendant has not established a reasonable probability that but for counsel's deficient performance, the outcome of the trial would have been different.

Defendant contends that the jury's questions to the court and the parties signaled that the jury was confused and disagreed as to the basis of defendant's guilt. While the jury deliberated, it asked the parties and the court the following sets of questions. First, "[w]e are confused about count two [felony-firearm]. Is possession of a second firearm required to satisfy count two? If so, does it matter which firearm is assigned to which count, one [felon-in-possession] or two [felony-firearm]?" Second, "[t]he jury would like to see the actual law that defines count two, felony firearm. Can the jury be hung on only one count and is the 380 associated with either of the counts?"[8] Third, "if the jury has successfully deliberated on one count but remains irrevocably hung on the other count, what further participation is required of the jury?" The trial court, in response to the question whether "the 380 [is] associated with either of the counts," instructed the jury, "[Y]ou decide."

Defendant sees these questions as evidence of jury confusion and disagreement over the factual basis of his convictions. However, we read them as indicating that the jury was not confused about count one, the felon-in-possession charge; it had reached unanimous agreement that defendant possessed a gun in violation of MCL 750.224f(1). The jury's question about the .380-caliber handgun in the second set of questions suggests that the jury had agreed that defendant possessed the .45-caliber handgun in violation of MCL 750.224f(1) and without justification. The third set of questions indicates that the jury was satisfied with its decision on the felon-in-possession charge. What the questions show, however, is that the jury did not immediately understand that felon-in-possession was the predicate felony for felony-firearm, which meant that it could find defendant guilty of felony-firearm based solely on its finding that he was a felon-in-possession, i.e., without having to find that defendant also possessed the .380-caliber handgun. See *People v Dillard*, 246 Mich App 163, 168; 631 NW2d 755 (2001) (holding that felon-in-possession can serve as the felony predicate for felony-firearm without violating the prohibition

---

[8] The trial court advised the jury that it could be hung on only one count. Later, the jury indicated that it had reached a verdict on count one and was deadlocked on count two. The court read the standard deadlocked instruction and the jury later returned its verdict of guilty on both counts.

-6-

against double jeopardy). The record implies that the jury did what a specific unanimity instruction would have told it to do: its members appear to have unanimously agreed that defendant possessed the .45-caliber handgun in violation of MCL 750.224f(1), and therefore, that defendant was guilty of felon-in-possession. Thus, defendant is left only with conjecture. In other words, defendant has not established a reasonable probability that the outcome would have been different had defense counsel requested a specific unanimity instruction. Because defendant has not established that he suffered prejudice from counsel's presumed deficiency, his ineffective assistance claim fails.

## 2. FELON-IN-POSSESSION JURY INSTRUCTION

Defendant next argues that his trial counsel rendered ineffective assistance by failing to request an instruction that defined constructive possession for purposes of the felon-in-possession charge as requiring that defendant "knowingly had the power and the intention to exercise dominion and control over" the weapon. Defendant argues that a minimally competent defense counsel would have known the definitions relevant to the charged crimes and protected his rights by requesting an instruction that properly defined the elements of the crimes. Defendant further argues that counsel's performance prejudiced him by allowing the jury to find him guilty of felon-in-possession even if it believed his defense that he did not intend to exercise control over the .45-caliber handgun, merely because he knew its location and had reasonable access to it. Moreover, since felon-in-possession was the predicate felony for felony-firearm, and counsel's deficient performance resulted in his conviction for felon-in-possession, counsel's deficient performance also prejudiced defendant by resulting in his conviction for felony-firearm.

Defendant was convicted of violating MCL 750.224f(1), which prohibits a person convicted of a felony from, among other things, possessing a firearm until he or she has fulfilled the requirements necessary to have the right to possess a firearm restored. See also *People v Perkins*, 473 Mich 626, 629; 703 NW2d 448 (2005). Under Michigan law, possession of a firearm can be actual or constructive and can be proven by circumstantial evidence. *People v Hill*, 433 Mich 464, 470; 446 NW2d 140 (1989). A person has constructive possession of a weapon if he or she has proximity to the weapon together with an indicia of control. *Hill*, 433 Mich at 470, citing *People v Davis*, 101 Mich App 198, 202; 300 NW2d 497 (1980).

Both parties agreed to the jury instructions, including the trial court's use of M Crim JI 11.34b, and the trial court instructed the jury as follows with regard to actual and constructive possession:

> Definition of possession. Possession does not necessarily mean ownership. Possession means that either the person has actual physical control of the thing, as I do with the pen I am now holding, or the person knows the location of the firearm and has reasonable access to it.

Possession may be sole where one person alone possesses the firearm. Possession may be joint where two or more people share possession. [9]

As we have already indicated, under Michigan law, the concept of constructive possession of a firearm includes "proximity to the weapon together with indicia of control." *Hill*, 433 Mich at 470, citing *Davis*, 101 Mich App at 202; see also *People v Minch*, 493 Mich 87, 91-92; 825 NW2d 560 (2012) ("[A] person has constructive possession if he knowingly has the power and the intention at a given time to exercise dominion or control over a thing, either directly or indirectly."). To the extent that knowing the location of a firearm and having reasonable access to it does not adequately convey the notion of an intent to exercise control over the weapon, then defense counsel's failure to protect his client's rights by requesting a more accurate instruction constituted deficient performance under the first prong of the test for ineffective assistance of counsel. See *Trakhtenberg*, 493 Mich at 51. However, because the prosecution presented evidence from which the jury could reasonably infer defendant's intent to exercise control over the .45-caliber handgun, and given the relevance of this evidence to the jury's duty to determine whether defendant dispossessed himself of the weapon at the earliest possible moment once the danger to which defendant claimed self-defense had passed, we conclude that defendant cannot show that, but for counsel's failure to request a different jury instruction, a different outcome was reasonably probable.

Defendant testified that, after taking the .45-caliber handgun away from Bailey, he secured it as soon as possible by "drop[ping]" it in a box located in the barbershop's storeroom. Defense counsel framed this act as one of "dispossession," and argued to the jury that defendant dispossessed himself of the .45-caliber handgun as soon as possible after the immediate threat to his life had passed. This argument implied that defendant lacked the intent to keep the gun, i.e., to exercise control over it.

However, the prosecution presented evidence that called defendant's argument into question. The record suggests that defendant did not just "drop[]" the gun into the box of lightbulbs, but hid the .45-caliber gun by placing it at the bottom of the box, located behind a curtain in the storage room at the back of the barbershop, where only defendant would know where it was. He did not tell the responding officer about the gun, he did not tell any of the officers who initially searched the barbershop in search of a possible third suspect about the gun, he did not tell the officer who transported him to the hospital about the gun, he did not tell an officer who briefly interviewed him about the gun, and he did not tell his long-time friend who showed up at the hospital about the gun. In fact, Detective Hogan testified that defendant said Bailey had fled the scene with the gun, and when Hogan informed defendant that a search had revealed the whereabouts of the gun, defendant said, "[O]h, they must have put it there." It was not until Hogan further pressed defendant about discovery of the .45-caliber handgun that he admitted he had lied to Hogan.

_____

[9] M Crim JI 11.34b. See also *Hill*, 433 Mich at 470 (stating, "a defendant has constructive possession of a firearm if the location of the weapon is known and it is reasonably accessible to the defendant").

Given the prosecution's evidence suggesting defendant's intentional act of hiding the gun and of not telling anyone that he had it or where it was located, and his suggestions that someone other than he had it, a jury could reasonably infer that defendant did not intend to dispossess himself of the gun as soon as the danger was over, but rather, that up until police discovered the gun in the storage room, defendant had the power and intent to exercise control over the .45-caliber handgun. Therefore, even if counsel had requested and obtained a jury instruction defining constructive possession as requiring proof that defendant had the power and intent to exercise dominion and control over the handgun, defendant has not established a reasonable probability that the jury's verdict would have been any different. Because defendant has not met the second prong required to prevail on a claim of ineffective assistance, his claim must fail. See *Trakhtenberg*, 493 Mich at 51.

Affirmed.


/s/ Karen M. Fort Hood
/s/ Jane M. Beckering
/s/ Mark T. Boonstra